In re Thomas W. CROOK, Janeene H. Crook, Debtors.

MAINE BONDING & CASUALTY CO., Plaintiff,

v.

Thomas W. CROOK, Defendant.

Bankruptcy No. 280–00631.
Adv. No. 281–0011.

United States Bankruptcy Court, D. Maine.

Aug. 28, 1981.

Peter J. DeTroy, III, Norman & Hanson, Portland, Maine, for plaintiff.

Albert C. Boothby, Jr., Brunswick, Maine, for defendant.

## MEMORANDUM DECISION

FREDERICK A. JOHNSON, Bankruptcy Judge.

Maine Bonding and Casualty Co. ("Maine Bonding") seeks a determination of the dischargeability of a debt incurred by the Debtor, Thomas W. Crook, in connection with his activities as a professional fund raiser. Maine Bonding contends the debt is nondischargeable under three subsections of Section 523 of the Bankruptcy Code. 11 U.S.C. § 523. The Court must disagree with Maine Bonding's contentions.

## FINDINGS OF FACT

In 1976 the Debtor founded an organization entitled "Crook Heritage Associates" to conduct a variety of fund raising activities.

In 1978 the Debtor was engaged to raise funds for the Portland Museum of Art. In order to comply with Maine's Charitable Solicitations Act (9 M.R.S.A. § 5002 et

seq.),[1] he arranged to have a professional fund raiser's bond issued by Maine Bonding.

On March 16, 1978, the Debtor, Maine Bonding and Maine Savings Bank ("Maine Savings") entered into the following agreement:

> It is understood by the undersigned that Maine Savings Bank agrees to lend Thomas W. Crook $10,000, at 10% Annual Percentage Rate, payable monthly at $100.00, payment to be applied first to interest and the balance to principal, for the purpose of purchasing a fund raising bond to be written by Maine Bonding & Casualty Company. This agreement contemplates Thomas W. Crook d/b/a Crook-Heritage Associates, working on behalf of the Portland Museum of Art for a period of time yet to be established; however, it is agreed by the undersigned parties that when such determination of the term of the fund drive is established, that this loan will be due and payable on the expiration of that term by cancellation of the bond.
>
> The Bonding Company further agrees to hold $10,000 under its control and that on expiration of the term and on the termination of the Bonding Company's liability to the State of Maine will release funds only to Maine Savings Bank to be applied solely to the aforementioned $10,000 loan, together with any outstanding interest with any residual balance as a result of amortization being forwarded to Thomas W. Crook by Maine Savings Bank.

On March 17, 1978 the $10,000 was deposited in a savings account at Portland Savings Bank ("Portland Savings") and the passbook was delivered to Maine Bonding. Maine Bonding then issued a bond for $10,000 running to the State of Maine, and the Debtor began his fund raising activities.

In January of 1980 the Debtor terminated his fund raising activities for the Portland Museum of Art. He contacted Maine Bonding requesting cancellation of the $10,000 bond. On February 22, 1980 after obtaining clearance from the office of the Secretary of State, an officer of Maine Bonding wrote to Portland Savings:

> Maine Bonding and Casualty Company has received conformation from the Secretary of States Office that we have been relieved of all liability under the captioned $10,000. Professional Fund Raisers Bond.
>
> Maine Bonding therefore consents to the release of the $10,000. collateral, passbook # 210393, we have been holding as security for the bond.
>
> Thanks very much for your assistance.

At the same time the officer called Maine Savings in order to keep the bank informed.

On February 22, 1980 the passbook was delivered to the Debtor and he acknowledged its receipt by signing an appropriate space provided on the bond.

In returning the passbook to the Debtor Maine Bonding violated its agreement with Maine Savings Bank. The agreement provided:

> The Bonding Company further agrees to hold $10,000 under its control and that on expiration of the term and on the termination of the Bonding Company's liability to the State of Maine will release funds only to Maine Savings Bank to be applied solely to the aforementioned $10,000 loan, together with any outstanding interest. . . .

After the Debtor obtained possession of the passbook he withdrew the funds from Portland Savings Bank and used some of them to pay various debts. $1,500 was paid to Maine Savings Bank on a mortgage and to bring up to date the fund raisers bond loan. The Debtor used the remainder of the $10,000 over a period of time to pay current bills.

The Debtor testified that when he executed the agreement, on March 16, 1978, he

---

1. 9 M.R.S.A. § 5008 prohibits any person from acting as a professional fund raiser until he files with and has approved by the Secretary of State of $10,000 bond on which he is the principal obligor with at least one surety. The bond runs "to any person who may have a cause of action against the principal obligor of the bond for any malfeasance or misfeasance in the conduct of charitable solicitation in this State."

understood that the funds were to be turned over to Maine Savings Bank; but, nearly two years later, on February 22, 1980, not having looked at the agreement, he forgot what the terms of the agreement were. In 1980 he understood that the pass-book was collateral for the bond; but not for the Maine Savings' loan.

After the bond was cancelled and the funds withdrawn, the Debtor continued to make periodic $100 monthly payments to Maine Savings through August of 1980. Maine Savings apparently accepted these payments and never indicated to the Debtor that the entire $10,000 was due. After he missed a payment in September of 1980, the Debtor received a letter from Maine Savings asking that payments be increased on his business loan.

In November or December of 1980 Maine Savings brought to the Debtor's attention that under the terms of the 1978 agreement the loan was due and payable upon cancellation of the bond.

On December 24, 1980 the Debtor filed for relief under Chapter 7 of the Bankruptcy Code. In his schedules he listed Maine Savings as a creditor in the amount of $9,470.42 for the business loan. Maine Bonding was not listed as a creditor on the Debtor's petition until February 10, 1981, after the Debtor was informed that Maine Bonding had paid off Maine Savings' claim and that Maine Bonding was now asserting the claim against the Debtor.[2]

## DISCUSSION

The obvious reason that this proceeding is before this Court is that "somebody goofed!" It is highly unlikely that Maine Bonding would have deliberately violated the terms of its 1978 agreement with Maine Savings Bank. Somebody at Maine Bonding simply forgot the terms of the two year old agreement and failed to check. This gives credence to the Debtor's testimony that he also forgot the terms of the agreement.

In its efforts to extricate itself Maine Bonding invokes three subsections of Section 523(a) of the Bankruptcy Code.

Maine Bonding's first contention is that its claim is nondischargeable under Section 523(a)(6) of the Bankruptcy Code since it was incurred as a result of a wilful and malicious conversion of Maine Bonding's property.

■ 11 U.S.C. § 523(a)(6) excepts from discharge any debt "for wilful and malicious injury by the debtor . . . to the property of another entity." A wilful and malicious conversion of another's property is encompassed within this provision. 3 *Collier on Bankruptcy* ¶ 523.16 (15th ed. 1980) at 523–114 & 123.

The First Circuit has defined a wilful and malicious act as one "done deliberately and intentionally in knowing disregard of the rights of another." *In re Nance,* 556 F.2d 602, 611 (1st Cir. 1977), *citing Bennett v. W. T. Grant Co.,* 481 F.2d 664 (4th Cir. 1973).

. . . [A] technical conversion without conscious intent to violate the rights of another, and under mistake or misapprehension, is dischargeable. 3 *Collier, supra* at 523–123, *citing Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1935).

■ Maine Bonding has not made a clear and convincing showing that the Debtor acted in knowing disregard of the rights of Maine Savings or Maine Bonding when he obtained the funds and used them for a purpose other than that which was originally contemplated by the parties.

The circumstances of this case indicate that the Debtor may very well have forgotten that the loaned money was to be used only for the fund raising bond and that it was to be returned to Maine Savings immediately upon cancellation of the Debtor's fund raising activities. Maine Bonding itself had obviously forgotten the provisions of the agreement which had been entered

---

**2.** Sometime in December of 1980 or January of 1981 Maine Bonding paid off the Debtor's debt to Maine Savings because of its agreement with

Maine Savings that it would release the collateral only to Maine Savings.

into approximately two years prior to the Debtor's seeking cancellation.

The conduct of all three parties subsequent to the Debtor's obtaining the funds adds further weight to his contention that he had forgotten the arrangement regarding the $10,000 loan. The Debtor's disposition of the funds indicates he did not act in knowing disregard of the rights of Maine Savings or Maine Bonding. Part of the proceeds went to pay arrearages to Maine Savings. The Debtor continued making periodic monthly payments on the $10,000 loan for six more months after receiving the proceeds. There is no evidence to indicate that Maine Savings or Maine Bonding ever contacted the Debtor to seek immediate payment to Maine Savings until November or December of 1980, about nine months after the funds were released.

Since Maine Bonding failed to clearly and convincingly show that the Debtor acted in knowing disregard of the rights of Maine Savings or Maine Bonding, his debt in approximately that amount cannot be held nondischargeable based on Section 523(a)(6).

Maine Bonding next contends that the debt owed it is nondischargeable under 11 U.S.C. § 523(a)(4) because it is a debt resulting from embezzlement. Maine Bonding claims it entrusted the Debtor with funds to be used for the specific purpose of delivering them to Maine Savings.

■ "Embezzlement is the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." 3 *Collier on Bankruptcy* (15th ed. 1980) ¶ 523.-14[3] at 523–106. Under the Code embezzlement need not have been committed while in a fiduciary capacity to be found nondischargeable. 3 *Collier on Bankruptcy*, (15th ed. 1980) ¶ 523.14[1][c] at 523–98. However, the creditor challenging a debtor's discharge of a debt resulting from an alleged embezzlement must show that the debtor acted with fraudulent intent or deceit. *In re Walker,* 7 B.R. 563, 7 B.C.D. 68 (Bkrtcy., M.D.Ga.1980) *citing Moore v. United States,* 160 U.S. 268, 16 S.Ct. 294, 40 L.Ed. 422 (1895).

■ The Debtor's disposition of the money which had lawfully come into his hands does not indicate a fraudulent intent. He did not attempt to conceal his disposition of the $10,000 and he had reasonable grounds to believe he had a right to use the money since Maine Bonding released it to him and Maine Savings never asked for its return.

"The retention of property in good faith, without secrecy or concealment, under a bona fide claim of right based upon reasonable grounds, generally is inconsistent with a fraudulent intent to embezzle." 26 Am. Jur.2d *Embezzlement* § 21. Therefore, the debt owed Maine Bonding is not a debt resulting from embezzlement.

Finally, Maine Bonding contends that the debt owed it should be excepted from discharge because it is a debt for money obtained by false pretenses, a false representation or actual fraud. Maine Bonding contends that the Debtor stated to the Maine Bonding employee who released the funds that he would return them to Maine Savings. This is denied by Mr. Crook. Alternatively, Maine Bonding bases its deceit allegations on the Debtor's silence regarding his intentions in circumstances where he should have known that Maine Bonding had assumed he was planning to return the funds to Maine Savings.

■ 11 U.S.C. § 523(a)(2)(A) excepts from discharge any debt for obtaining money by false pretenses, a false representation or actual fraud.

Obtaining money by false pretenses or false representations only encompasses those frauds involving "moral turpitude or intentional wrong; fraud implied in law which may exist without imputation of bad faith or immorality, is insufficient. It must further affirmatively appear that such representations were knowingly and fraudulently made..." 3 *Collier on Bankruptcy* (15th ed. 1980) ¶ 523.08[4] at 523–39–40.

Actual fraud "consists of any deceit, artifice, trick, or design involving direct or active operation of the mind, used to cir-

cumvent and cheat another—something said, done or omitted with the design of perpetrating what is known to be a cheat or deception." *Id.* ¶ 523.08[5] at 523–47.

The actions of the parties at the time of surrender of the passbook to the Debtor do not indicate that the Debtor obtained the passbook and the money by false pretenses, a false representation or actual fraud. Their actions, rather, indicate, as previously stated, that neither party remembered the terms of the 1978 agreement and, as a result, a mistake was made. The evidence falls far short of establishing false pretenses, or false representation, or actual fraud within the intent of Section 523(a)(2)(A).

In light of the basic purpose of bankruptcy law to afford debtors "a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt," the exceptions to the operation of discharge should be confined to those plainly expressed. *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934). Maine Bonding failed to establish by clear and unconvincing evidence that its claim falls within any of the exceptions to discharge.

An appropriate order will be entered.