In the Matter of Anthony Dwight THURSTON, Debtor.

GREYHOUND LINES, INC., Plaintiff,

v.

Anthony Dwight THURSTON, Defendant.

Bankruptcy No. 81–50385.
Adv. No. 81–5091.

United States Bankruptcy Court,
M. D. Georgia,
Macon Division.

March 19, 1982.

Theodore M. Forbes, Jr., Gambrell & Russell, James L. Paul, Gambrell & Mobley, Atlanta, Ga., for plaintiff.

Byrd Garland, Garland & Milam, P.C., Jackson, Ga., for defendant.

## MEMORANDUM DECISION ON COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

ROBERT F. HERSHNER, Jr., Bankruptcy Judge.

### STATEMENT OF THE CASE

Before the Court is the complaint of Greyhound Lines, Inc. (Plaintiff), seeking a determination that a certain debt owed to it by Anthony Dwight Thurston (Defendant) is nondischargeable in bankruptcy. The Defendant filed his voluntary petition under Chapter 7 of Title 11 of the United States Code on April 7, 1981. The Plaintiff filed its complaint on June 12, 1981, and within the time prescribed by law, the Defendant filed his answer. The matter came on regularly for trial on September 21, 1981.

After consideration of the evidence and arguments of counsel, the Court has this day entered an order determining the debt owed by the Defendant to the Plaintiff to be dischargeable in bankruptcy. In support of its order, the Court attaches the following findings of fact and conclusions of law. To the extent any findings of fact constitute conclusions of law, or any conclusions of law constitute findings of fact, they are so adopted.

### FINDINGS OF FACT

The Plaintiff is a common carrier, furnishing bus service to and from Jackson, Georgia, and the Defendant became the commissioned agent for the Plaintiff in Jackson on or about September 1, 1978. The agency agreement between these parties was created by their execution of the Plaintiff's "Standard Commission Agency Contract." The first agency contract between the parties was executed on or about September 1, 1978, but because of a technical error in this first contract, the parties executed a second contract approximately two months later. This second agreement was backdated by the Plaintiff and the Defendant to September 1, 1978, and considered by them to be effective as of the backdate.

This agreement consists of the front and back of one sheet of paper. The front contains section I of the agreement, which basically commits the Plaintiff to pay certain commissions to the Defendant. The back contains two sections, section II containing what the Defendant agrees to do and section III containing mutual covenants between the Plaintiff and the Defendant.

Under section II, paragraph "D" provides that the agent (Defendant) agrees as follows:

To be liable for all charges for transportation services sold regardless of collection of such charges. To be liable for and protect at all times any and all money and/or property of the Company [Greyhound Lines, Inc.] in the care or under the supervision of Agent [Anthony Thurston]; and to reimburse Company for any loss of or damage to such money and/or property. At his expense to furnish an Indemnity Bond in an amount specified by the Company for the protection of company funds and/or property. The title to all tickets and proceeds thereof and of all other monies collected for Company shall be at all times in the Company, it being the intention of this agreement that the Agent shall at all times be in the position of trustee and fiduciary of the same for the Company.

Section II also provides in paragraph "E" that the agent agrees:

To render reports of Company business on the last day of each month, and to remit to Company or deposit to account of Company on the last day of each month, or at such other times as may hereafter be prescribed by the Company, all monies belonging to the Company or collected for the account of Company.

Paragraph "D" of section II is the only specific mention in the Standard Commission Agency Contract that a trust relationship was to exist between the Plaintiff and the Defendant.

From September 1, 1978 until March 8, 1979, the Defendant was the agent for the Plaintiff in Jackson, Georgia. The Defendant operated an incorporated grocery store, Jackson Three Superette, Inc., at 35 Dempsey Avenue, Jackson, Georgia, and the location was used by the Defendant to furnish the agency services that he was required to furnish to the Plaintiff. Simply stated, the Defendant was to furnish the Plaintiff with a physical location from which the Plaintiff's passengers could arrive and depart and which was also to serve as a location from which the passengers could purchase their tickets. This location thus served as the Plaintiff's bus station in Jackson, Georgia.

The Defendant did not take an active part in running either the grocery store or the bus station but had a young man, James Harry Tingle, running them. Mr. Tingle generally handled all of the duties associated with the bus station, including selling tickets, collecting monies, and filling out the required monthly reports.

Sometime in late February 1979, Elton S. Duke, the District Supervisor for the Plaintiff, went to the bus station to inquire about the Defendant's remittance for sales during January 1979, as the remittance had not been timely made to the Plaintiff. Mr. Duke found the grocery store and bus station being operated by Mr. Tingle. Mr. Duke was able to obtain from Mr. Tingle the Defendant's personal check for the January remittance and also inquired about the February monthly report. Mr. Tingle advised Mr. Duke that the February monthly report had not been prepared, and Mr. Duke, after converting the Defendant's personal check to a cashier's check, returned to the Plaintiff's business office.

Several days later Mr. Duke returned to get the Defendant's February report and once again found the grocery store and bus station being operated by Mr. Tingle. Mr. Tingle furnished the Defendant's February monthly report to Mr. Duke but was unable to give the February remittance to Mr. Duke. Mr. Duke once again returned to the Plaintiff's office and then on March 8, 1979, at the direction of his supervisors, returned to the bus station and did what is termed a "cash cutoff." The cash cutoff amounts to an audit and final accounting, and upon completion of the cash cutoff, Mr. Duke terminated the Defendant's agency with the Plaintiff by removing from the bus station all of the Plaintiff's property, including all records and unsold tickets.

The cash cutoff revealed an amount due the Plaintiff of $560.90 for the period from March 1, 1979 through March 8, 1979. The amount due the Plaintiff for February was $2,841.09.

The testimony is conflicting as to what happened to the money that the Defendant collected in his capacity as agent for the Plaintiff. Mr. Tingle testified that Mr. Duke got the cigar box into which all of the agency collections were put, and that he recovered everything else that belonged to the Plaintiff. Mr. Tingle testified that he assumed the cigar box contained the collections, but he admitted that he did not know if any money was in the cigar box at the time Mr. Duke recovered it.

Mr. Duke, on the other hand, testified that he did not remember any cigar box and did not receive any money. He testified that he would definitely remember receiving a cigar box with over $3,000.00 in it.

There was no testimony as to whether the Defendant ever had physical possession of the money. It has not been shown that he received the money from Mr. Tingle, took the money from the cigar box, or deposited the money to his own account. Neither has it been shown that Mr. Tingle ever removed the money from the cigar box or took the money for his own use. The only showing has been that there was an unexplained disappearance of the money collected during February and March of 1979.

## CONCLUSIONS OF LAW

This Court has jurisdiction over the parties and subject matter herein.

██ The Plaintiff seeks to have the debt due it from the Defendant declared nondis-

chargeable. Therefore, the Plaintiff has the burden of proving that its debt comes within Section 523 of the Bankruptcy Code, 11 U.S.C.A. § 523 (West 1979). *Murphy & Robinson Investment Co. v. Cross (In re Cross)*, 666 F.2d 873 (5th Cir. 1982);[1] *Love v. Tower Loan of Mississippi, Inc. (In re Love)*, 577 F.2d 344 (5th Cir.) reh. denied, 582 F.2d 41 (5th Cir. 1978).

The Plaintiff's first argument is based on Section 523(a)(4) of the Code:

> (a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—
>
> . . . .
>
> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny;

11 U.S.C.A. § 523(a)(4) (West 1979).

The Plaintiff contends that under the terms of paragraph "D" of its "Standard Commission Agency Contract," the Defendant is a fiduciary within the meaning of Section 523(a)(4), and that his failure to account for the funds in question is a defalcation which places its debt within the statutory exceptions to discharge. To support this contention, the Plaintiff cites the Court to the cases of *Greyhound Lines, Inc. v. Hunter (In re Hunter)*, Bankruptcy No. 76 B 2749 (Bkcy.Ct.S.D.N.Y.1977); *Greyhound Lines, Inc. v. Reeves (In re Reeves)*, BK2–79–59/60 (Bkcy.Ct.N.D.Tex.1980); and *Morgan v. American Fidelity Fire Ins. Co.*, 210 F.2d 53 (8th Cir. 1954).

First, the Court must note that all of the cases cited by the Plaintiff are merely persuasive and not binding precedent on this Court.

Secondly, upon analysis, these cases are all distinguishable from the case before this Court.

In the *Hunter* decision, the court did find a fiduciary relationship falling under Section 17(a)(4) of the former Bankruptcy Act, the statutory predecessor to Section 523(a)(4) of the current Bankruptcy Code. It found this relationship arising from a contract which evidently closely resembles the contract presently before this Court, but there is one very significant difference between the *Hunter* case and this case. The contract before the court in *Hunter* required segregation of funds by Hunter by daily deposit to a bank designated by Greyhound. Under the contract before this Court, there is no such duty to segregate funds, and the Plaintiff made no effort to require the Defendant to segregate funds in a separate account.

In the *Reeves* decision, the court does not discuss the facts from which it concludes there to be a fiduciary relationship between the parties. It states that there was a deliberate misappropriation of money by the defendant and states that it took place while the defendant was a fiduciary. Without this Court knowing the factual basis for the *Reeves* decision, it simply is of little value as precedent.

The *Morgan* case was decided by the United States Court of Appeals for the Eighth Circuit in 1954 and is not binding on this Court. The case found a fiduciary relationship existing between an insurance agent and his insurance company, apparently on the weight of certain language in the agent's contract with his company.[2]

---

1. Although *Cross* is not binding precedent on this Court, because it was decided after the creation of the United States Court of Appeals for the Eleventh Circuit on October 1, 1981 (the circuit within which this United States Bankruptcy Court sits), it is still a decision in a case of the former Fifth Circuit which was pending upon the creation of the Eleventh Circuit and, as such, is highly persuasive to this Court.

2. The language is as follows:

    Agent has full power and authority to accept proposals for insurance covering automobile risks as Company may, from time to time, authorize to be insured; to charge the premium for such proposals as set forth in the manual of insurance approved by the Insurance Department of the State in which the risk is located, and in accordance with the rules of said manual; to collect, receive and receipt for premiums on insurance tendered by Agent to and accepted by the Company. All premiums received by agent shall be held by agent in a fiduciary capacity as trustee for Company until delivered to Company or its managers.
    *Morgan*, 210 F.2d at 54.

The language before this Court is similar to the language construed by the Court in *Morgan*, but once again the actual workings of the trust are not disclosed by the court in its opinion. Absent this showing by the *Morgan* Court, the decision is not very helpful to this Court's analysis of the case before it.

This Court is a court of the Eleventh Circuit and, as such, is bound by all decisions of the United States Court of Appeals for the Eleventh Circuit and by the decisions of the former United States Court of Appeals for the Fifth Circuit which were handed down prior to September 30, 1981. *Bonner v. City of Prichard, Alabama*, 661 F.2d 1206, 1209 (11th Cir. 1981). From an analysis of decisions which serve as binding precedent on this Court, this Court must find that no fiduciary relationship existed between the Plaintiff and the Defendant.

In *Angelle v. Reed* (In re Angelle), 610 F.2d 1335 (5th Cir. 1980), the United States Court of Appeals for the Fifth Circuit examined whether a fiduciary relationship was imposed upon a real estate contractor under the terms of a Louisiana statute. The Court, in *Angelle*, found that a technical trust is required to create a fiduciary relationship within the meaning of Section 17(a)(4) of the Bankruptcy Act and stated further that the imposition of trust-like duties (e.g. segregation of funds) is an essential element in such a relationship. 610 F.2d at 1340–41.

The Fifth Circuit was confronted with the same question in *Carey Lumber Co. v. Bell*, 615 F.2d 370 (5th Cir. 1980). In that case, the court noted that Section 17(a)(4) of the Bankruptcy Act applied to all true trusts and not to fiduciary relationships arising out of equitable or implied trusts. The Court, in applying an Oklahoma statute, found that the statute created an express trust with a clearly defined trust res, and that the statute charged the trustee with affirmative duties.

These cases are careful to point out that for a fiduciary relationship to exist, upon which an action for nondischargeability can lie, that a true trust must exist in which there is a segregated trust res and affirmative trust duties. This view is restated in the *Cross* case in which the Court found that in order to be a fiduciary under Section 17(a)(4) of the Bankruptcy Act, a preexisting fiduciary duty was necessary, and that trust duties, such as the segregating of funds, are necessary to create the technical trust necessary to come within the statute. *Cross*, 666 F.2d at 881.

The question, as to what constitutes a fiduciary relationship, has been addressed twice by this Court. Under Section 17(a)(4) of the Bankruptcy Act, The Honorable W. J. Patterson, Jr. in *Greyhound Lines, Inc. v. Young* (In re Young), No. 76–408–Mac (Bkcy.Ct.M.D.Ga.1977), found that an agent whose contract called for the daily deposit of funds into a separate bank account was not a fiduciary within the meaning of the statute. In another decision, The Honorable Henry D. Evans found the necessity for a technical trust imposing affirmative trust duties when he determined the meaning of fiduciary under Section 523(a)(4) of the Bankruptcy Code. *Mullis v. Walker (In re Walker)*, 7 B.R. 563, 7 B.C.D. 68 (Bkrtcy.Ct. M.D.Ga.1980).

The relationship created between the Plaintiff and the Defendant by the contract before this Court, which contract arguably creates a true or technical trust sufficient to bring the Plaintiff's debt within Section 523(a)(4) of the Bankruptcy Code, upon a factual analysis, must be found by the Court not to have reached the level of a fiduciary relationship. The evidence discloses that the Defendant was under no duty to segregate the funds collected by the bus station operation, and in fact, the Plaintiff appears to have never insisted upon a segregation. The relationship between the Plaintiff and the Defendant was very informal, with the only accounting being the monthly reports to the Plaintiff, and the Court notes here that the only evidence before it is that the Plaintiff accepted the Defendant's personal checks as payment for the monthly collections. The Plaintiff knew that the Defendant was not segregating funds, and the relationship that existed

between the parties simply did not rise to that of a fiduciary relationship. Since no fiduciary relationship existed, the Defendant's debt to the Plaintiff cannot be held to be nondischargeable under that portion of Section 523(a)(4) which excepts from discharge the misappropriations or defalcations of fiduciaries.

■ The Court now turns to the Plaintiff's contention that the Defendant's debt to it is nondischargeable because it was created by embezzlement or larceny. "Embezzlement is the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come. . . ." 3 Collier on Bankruptcy ¶ 523.14[3], 523–106 (15th ed. 1981) (quoting Black's Law Dictionary 4th Revised Edition). Embezzlement in Georgia is called theft by conversion and is defined by Ga.Code Ann. § 26–1808 (1977). For a person to be guilty of embezzlement in Georgia, it must be shown that he knowingly converted the funds or property of another to his own use without legal authority. A similar showing is required for embezzlement under Section 523(a)(4) of the Bankruptcy Code, and thus a knowing and fraudulent appropriation of property must be shown.

The Plaintiff here has not shown any appropriation of the collected funds. They have not been traced to the Defendant, and it was not shown that he knowingly converted them to his own use.

Except for the way in which funds or property first come into the possession of a party, larceny does not differ from embezzlement. 3 Collier on Bankruptcy ¶ 523.-14[3] (15th ed. 1981). Thus, in larceny, a fraudulent appropriation of funds or property to a party's own use must also be shown. The Plaintiff has made no showing that the Defendant appropriated the collected funds to his own use.

Thus, the Plaintiff has failed to show that its debt from the Defendant is nondischargeable under Section 523(a)(4).

■ The second contention of the Plaintiff is based on Section 523(a)(6) of the Bankruptcy Code, which states:

> (a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—
>
> . . . .
>
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

11 U.S.C.A. § 523(a)(6) (West 1979).

The Plaintiff relies on a case from this Court, *Young*, supra, in arguing that the mere shortage of funds by the Defendant is sufficient to show a willful and malicious injury to its property. The *Young* case was decided under Section 17(a) of the Bankruptcy Act, 11 U.S.C.A. § 35(a) (West Supp. 1979) (repealed 1979), and in part is based on the case of *Tinker v. Colwell*, 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904). To the extent that the *Tinker* and *Young* cases imply that specific intent to injure is not required for a willful and malicious injury under Section 523(a)(6), they have been legislatively overruled. H.R.Rep.No.95–595, 95th Cong., 1st Sess. 365 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787. It is necessary for the Plaintiff to show that the action causing the injury was deliberate and intentional.

In this case, the Plaintiff has not shown deliberate or intentional action on the part of the Defendant which has injured the Plaintiff. The Plaintiff has simply shown that certain funds were unaccounted for upon its conducting its cash cutoff, and this showing alone is insufficient for this Court to find that the Plaintiff has carried its burden to show that its debt is nondischargeable as a willful and malicious injury to its property. The import of Section 523(a)(6), and the case law interpreting it, requires more to be shown. 3 Collier on Bankruptcy ¶ 523.16 (15th ed. 1981).

Accordingly, the Plaintiff also has failed to carry its burden as to Section 523(a)(6). Therefore, the Court must find that the debt owed by the Defendant to the Plaintiff is dischargeable in bankruptcy.